UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| ALYSSA ISEMAN and | ) | |
| POSITIVELY MEDIEVAL, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:19-CV-365-TRM-DCP |
| | ) | |
| M. JACOB WERNER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.  Now before the Court are Plaintiffs' Motion for Leave to Amend Complaint [Doc. 18] and Motion for Leave to Substitute Proposed Amended Pleading [Doc. 20], and Defendant's Motion for Hearing [Doc. 32].

Accordingly, for the reasons stated below, Plaintiffs' Motion for Leave to Amend Complaint [Doc. 18] will be **GRANTED,** Plaintiffs' Motion for Leave to Substitute Proposed Amended Pleading [Doc. 20] will be **GRANTED**, and Defendant's Motion for Hearing [Doc. 32] will be **DENIED**.

I.      **BACKGROUND**

On September 20, 2019, Plaintiffs Alyssa Iseman and Positively Medieval, LLC filed their Original Complaint [Doc. 1] against Defendant, alleging causes of action for legal malpractice, breach of fiduciary duty, and negligent misrepresentation.  Plaintiffs then filed an Amended Complaint ("First Amended Complaint") [Doc. 10] on October 21, 2019 with the same three causes of action.  Defendant filed an Answer [Doc. 11] to the First Amended Complaint on November 4, 2019.

On April 27, 2020, Plaintiffs filed a Motion for Leave to Amend Complaint [Doc. 18], attaching a proposed Second Amended Complaint [Doc. 18-1], which asserted causes of action for legal malpractice, breach of fiduciary duty, negligent misrepresentation, fraud, a violation of the Tennessee Consumer Protection Act ("TCPA"), and conversion. The Court's Scheduling Order [Doc. 16] previously set a deadline of April 27, 2020 for the filing of any motions to amend the pleadings in this case.

Defendant filed his Response [Doc. 19] in opposition to Plaintiffs' motion on May 8, 2020. Defendant claimed that Plaintiffs' proposed TCPA claim was futile, as Plaintiffs did not have a private right of action against him, and thus requested that Plaintiffs' motion be denied with respect to the TCPA claim and corresponding claims for treble damages and attorneys' fees.

However, Plaintiffs also filed a Motion for Leave to Substitute Proposed Amended Pleading [Doc. 20] on May 8, 2020, seeking leave to substitute the proposed Second Amended Complaint ("Substitute Complaint"). The Substitute Complaint alleges causes of action for legal malpractice, breach of fiduciary duty, negligent misrepresentation, fraud, a violation of the Tennessee Consumer Protection Act, and conversion—similar to the Second Amended Complaint—but also asserts federal securities fraud claims and violations of the Tennessee "Blue Sky Law." *See* [Doc. 20-1].[1] Plaintiffs claimed that since the filing of their Motion for Leave to Amend Complaint [Doc. 18], they consulted with an expert in securities law, which led them to believe that they had legitimate causes of action under §10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5, as well as claims under Tennessee's "Blue Sky" law, Tenn. Code Ann. § 48-1-121(a). [Doc. 20 at 2].

---

[1] While the Substitute Complaint also alleged a civil conspiracy claim, Plaintiffs subsequently filed notice of the withdrawal of the count of civil conspiracy on June 30, 2020. [Doc. 36].

2

Defendant responded in opposition [Doc. 26], claiming that Plaintiffs' motion [Doc. 20] was an untimely motion to amend, as it was not filed until May 8, 2020, and Plaintiffs have failed to establish good cause to justify their motion. Additionally, Defendant claims that he will be prejudiced by the Substitute Complaint, and that Plaintiffs' motion should be denied with respect to their fraud claims, violation of the TCPA, federal securities fraud, and violation of the Tennessee Blue Sky Law, as these claims are futile.

Plaintiffs subsequently filed a Reply [Doc. 31] on June 15, 2020, claiming that there was only one motion to amend filed because the Court had yet to rule on the initial motion to amend, and thus the Substitute Complaint merely replaces the Second Amended Complaint. Additionally, Plaintiffs claim that they have established good cause to support any amendment, Defendant will not be prejudiced by the filing of the Substitute Complaint, and that Plaintiffs' newly asserted claims are not futile.

Defendant also filed a Motion for Oral Argument [Doc. 32], as well as accompanying Memorandum in Support [Doc. 33]. Defendant asserts that oral argument will assist the Court by allowing Defendant to address "[c]ertain representations and arguments made by the Plaintiffs" in their Reply, including Plaintiffs' failure to address several unresolved legal issues with respect to their common law fraud claim and the basis of Plaintiffs' claim of a "Ponzi scheme." [*Id.*]. Additionally, Defendant contends that oral argument will "present an in-court speaking opportunity for a young lawyer, Karissa H. Range, Esq., co-counsel of record for Mr. Werner." [Doc. 32].

Plaintiffs respond [Doc. 34] that there is no need for oral argument on the issues "because the parties have fully briefed the matters and further argument would serve no purpose other than

to needlessly increase the expenses of litigation for the parties." [*Id.* at 1]. Plaintiffs note the extensive briefing on this matter before the Court.

"The decision to allow for oral argument on request of one of the parties is entirely in the Court's discretion." *White v. Suarez Corp. Indus.*, No. 3:15-CV-411-TAV-HBG, 2016 WL 11597921, at *1 n.2 (E.D. Tenn. Nov. 4, 2016) (citing *Nam v. U.S. Xpress, Inc.*, No. 1:11-cv-116, 2012 WL 10161528, at *8 (E.D. Tenn. June 25, 2012)). Here, the Court finds that the parties have briefed the matter in a manner that makes additional argument unnecessary. Additionally, Defendant was granted leave to file excess pages in its response to Plaintiffs' motion. [Doc. 25]. Therefore, because the Court is capable of resolving the matter without a hearing, and in light of Plaintiffs' opposition to the motion, Defendant's Motion for Oral Argument [Doc. 32] will be **DENIED**.

## II.    FACTUAL ALLEGATIONS

This action stems from an alleged fraudulent scheme perpetrated upon the Plaintiffs, Alyssa Iseman ("Iseman") and Positively Medieval, LLC, after they entered into an investment opportunity to fund the development of a film/television project. The following factual allegations are taken from Plaintiffs' Substitute Complaint [Doc. 20-1].

Iseman was approached in summer of 2018 by Josh Hodgins ("Hodgins"), an individual who had been involved in financing entertainment industry projects, about a potential investment opportunity. [*Id.* at ¶ 8]. Iseman participated in a conference call on July 30, 2018 with Hodgins, Gene Francisconi ("Francisconi"), Ryan O'Quinn ("O'Quinn"), and Mike Davis ("Davis"), where she was told about an investment opportunity with a group that was interested in funding film and television projects and was typically involved in multi-million dollar transactions. [*Id.* at ¶ 8–9]. The Substitute Complaint alleges that Iseman was told that investor's funds would be placed in a

4

trust account of an attorney who would oversee the transaction, that she would have sole signatory access to the account along with Defendant, and that she would receive proof of how the funds were being used. [*Id.* at ¶ 10].

A second conference call took place on July 30, 2018 with Iseman, Hodgins, Francisconi, O'Quinn, Davis, and Allen Myers ("Myers"), wherein Myers explained the investment opportunity in more detail. [*Id.* at ¶ 11]. Myers elaborated that the investor's funds would be tied to the purchase of a banking instrument or bond, which would be bundled with other, similar bonds and sold to pre-qualified investors, typically returning three to four times the principal. [*Id.*]. Additionally, Myers represented that after the bundled bonds were purchased by the pre-qualified buyers, the funds would go into an attorney's trust account and distributed to investors, with a typical turnaround time for repayment of 45-60 days. [*Id.* at ¶ 12]. A second call also took place on July 30th, where Myers provided information on tax rebates and current rates. [*Id.* at ¶ 13]. Plaintiffs allege that during these telephone calls, Myers stated that the funds would be deposited into Defendant's trust account, who would represent all investors and oversee the entire transaction on behalf of all parties, and that Defendant was a licensed Tennessee lawyer. [*Id.* at ¶ 14]. Iseman completed a Client Information Package and Non-Solicitation Agreement to obtain specific information about the transaction, and was told that "first moneys" were needed to pay up-front costs and expenses necessary to cause registration of the bonds, and that the "first moneys" would be transferred into Defendant's escrow account so he could serve as the "paymaster." [*Id.* at ¶ 15].

Iseman then had several telephone calls with Defendant, where Plaintiffs allege that he "made representations about the legitimacy of the investment opportunity, described how the transaction would work, and described his role." [*Id.* at ¶ 16]. In particular, Defendant stated that Plaintiffs' funds would be placed into his trust account, as well as that he represented that the funds

5

would be safe, that he would serve as the paymaster for the distribution of the funds, that the funds would be used for fees and costs, and that all expenditures would be under his supervision. [*Id.*]. Defendant further represented that the funds would be tracked, that this information would be provided to Iseman, and that she would be given access to the IOLTA account once she deposited the funds into the account. [*Id.* at ¶ 17].

During a conference call, which included O'Quinn and Iseman, among others, "Defendant confirmed and acknowledged that he was representing the investors (Plaintiffs and Davis) and the film makers (Hodgins and O'Quinn) in the transaction." [*Id.* at ¶ 18]. Plaintiffs allege that in his conversations with Iseman, Defendant encouraged her to invest and assured her that the transaction, the bank, and the security were all legitimate. [*Id.* at ¶ 19]. Moreover, Defendant failed to mention Dan Masters ("Masters") or Benjamin Levine ("Levine"), advise Plaintiffs that he was the attorney for any unidentified persons, or advise that any portion of the funds would be transferred to Masters or Levine. [*Id.* at ¶¶ 22–25].

Defendant then prepared an opinion letter for Plaintiffs, and at the time of the delivery of the opinion letter, Defendant knew that Plaintiffs were a funds provider. [*Id.* at ¶ 26]. Plaintiffs allege that the letter was prepared at the direction of Masters and delivered to Myers. [*Id.*]. Specifically, the opinion letter states that Plaintiffs' funds would be safe in Defendant's IOLTA account, that all distributions would be "under [his] direction and approval," described how the funds would be utilized to purchase the bond on the "Euroclear Title Transfer System" and detailed that the funds would be tracked. [*Id.*].

Then, "[i]n early September [2018]," Iseman received a draft Joint Venture Agreement ("draft JVA") which specified the terms of the investment between ER2 Global International Holdings, LLC ("ER2") and Plaintiffs, with Myers identified as the authorized signatory for ER2.

6

[*Id.* at ¶ 28].  The draft JVA stated that ER2 had available "Government Bonds/Instruments" ("the Bond Instrument") that needed to be registered on international registration systems, and that ER2 had "prearranged institutional buyers" that were "ready, willing, and able" to purchase the Bond Instrument once registered.  [*Id.* at ¶ 29].  The draft JVA detailed that Plaintiffs would invest $650,000, which would be used to register the Bond Instrument, and upon registration, the Bond Instrument would be sold to one of the pre-qualified buyers, with Plaintiffs receiving $5,000,000 within 90 to 120 days.  [*Id.* at ¶ 31].  The draft JVA stated that Defendant was the "mutual attorney" for the parties, identified his IOLTA account as the depository for the funds, and attached the opinion letter prepared by Defendant.  [*Id.* at ¶¶ 35].

However, in reviewing the draft JVA, Iseman noticed that the opinion letter stated that Defendant was the attorney for Myers/ER2.  [*Id.* at ¶ 35].  Iseman emailed Myers on September 18, 2018, and he responded on September 19, 2020, stating that Defendant would send a new opinion letter outlining that "he represents Party 1 and 2."  [*Id.* at ¶ 36].  On September 20, 2018, Iseman received a revised version of the JVA, including the new opinion letter as an attachment, stating that Defendant was the "attorney for Allen Myers/ER2 and [Iseman and] ISEMAN-POSITIVELY MEDIEVAL-LLC."  [*Id.* at ¶ 38].  The JVA was executed on September 20, 2018 (hereafter referred to as the "Iseman JVA"), Defendant requested that Iseman wire the funds, and Plaintiffs transferred $650,000 to Defendant's IOLTA account.  [*Id.* at ¶¶ 40–43].

After the transfer, Defendant participated in several telephone calls wherein he made representations about the purchase of the Bond Instrument, "repeatedly indicating that Plaintiffs' return on their investment was forthcoming."  [*Id.* at ¶ 44].  Iseman also requested copies of the receipts showing how the first moneys were being utilized and access to the IOLTA account [*Id.* at ¶ 45],  and participated in a conference call with Defendant on December 21, 2018 where

Defendant "provided Plaintiffs assurances that banking fees and charges and security house fees and charges had been made," represented "that the necessary Society for Worldwide Interbank Financial Telecommunication forms had been completed," and "agreed to provide documentation showing how the Funds had been utilized." [*Id.* at ¶ 46]. However, Defendant did not provide documentation to Iseman about the utilization of the funds or access to the IOLTA account, and after several calls with the individuals involved, Iseman demanded return of her principal on February 20, 2019. [*Id.* at ¶¶ 47–48]. After calls on February 27 and April 2, 2020, Defendant stopped communicating with Iseman, and the funds have not been returned to Plaintiffs "nor has any amount been paid . . . in connection with their investment in the security." [*Id.* at ¶¶ 49–50].

Defendant also requests that the Court consider several documents, including the correspondence between the parties and the Iseman JVA, submitted as exhibits to his Response [Docs. 26-1–26-6], as the documents are referenced in the Substitute Complaint. *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (noting the Court may consider "the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein").

The Court notes that a motion to dismiss has not been filed at this time, and the undersigned is tasked only with considering whether Plaintiffs' proposed Substitute Complaint is futile while addressing the motion to amend. *See Short v. USAA Cas. Ins. Co.*, No. 10-CV-766-TCK-PJC, 2012 WL 208091, at *2 (N.D. Okla. Jan. 24, 2012) ("In opposition to the Motion to Amend, USAA CIC argues that the proposed amendments are futile . . . In opposition to the motion to amend, USAA CIC attached several exhibits outside the pleadings. For reasons explained below, the Court will not consider such evidence in ruling on the motion to amend.");

*Collins v. Hunter*, No. CIV.A.05-624 SLR, 2006 WL 1582220, at *1 (D. Del. June 7, 2006) ("The State defendants filed an opposition to the motions [to amend], along with exhibits containing matters outside the pleadings. The court will not consider these exhibits. The State defendants are advised that submitting exhibits to the court on matters contained outside the pleadings are more appropriate at the summary judgment stage."). However, as Plaintiffs also cited to the attached exhibits, including the Iseman JVA, *see* [Doc. 30 at 9, 17], the Court will consider the exhibits as referenced by Plaintiffs.

## III.    STANDARD

Federal Rule of Civil Procedure 15(a)(1) provides for amendments as a matter of course:

A party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

"In all other cases, a party may amend its pleadings only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

Despite the liberality of Rule 15(a)(2), courts have explained that motions to amend may be denied if the court finds undue delay, bad faith, or dilatory motive, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice, and futility of the amendment. *Scheib v. Boderk*, No. 3:07-CV-446, 2011 WL 208341, at *2 (E.D. Tenn. Jan. 21, 2011) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Although the Sixth Circuit's balancing test incorporates this standard, the Sixth Circuit "freely allow[s] the amendment of pleadings in the absence of substantial prejudice to the opposing party." *Lawson v. Truck Drivers, Chauffeurs & Helpers, Local Union 100*, 698 F.2d 250, 256 (6th Cir. 1983) (collecting cases).

9

"A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Riverview Health Institute LLC v. Medical Mutual of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (quoting *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)).  In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Further, a district court must "(1) view the complaint in the light most favorable to the plaintiff and (2) take all well pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009)). However, the Court "need not accept a bare assertion of legal conclusions." *Id.* at 488.

Additionally, under Federal Rule of Civil Procedure 9(b), a complaint "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake."  The Sixth Circuit has interpreted Rule 9(b) as requiring the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc. (Omnicare I)*, 583 F.3d 935, 942–43 (6th Cir. 2009) (citations and internal quotation marks omitted). "A court need not accept claims that consist of no more than mere assertions and unsupported or unsupportable conclusions." *Sanderson v. HCA–The Healthcare Co.,* 447 F.3d 873, 876 (6th Cir. 2006) (citing *Kottmyer v. Maas,* 436 F.3d 684, 688 (6th Cir. 2006)).  Also, "[c]onclusory statements of reliance are not sufficient to explain with particularity how [a plaintiff] detrimentally

10

relied on the alleged fraud." *Evans v. Pearson Enters.,* 434 F.3d 839, 852–53 (6th Cir. 2006) (citing *Smith v. Mitlof,* 198 F. Supp. 2d 492, 504–05 (S.D.N.Y. 2002)). Complaints alleging securities fraud must also meet the heightened pleading standard of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(2).

## IV.    ANALYSIS

### A.    Timeliness

Defendant first claims that Plaintiffs' Motion for Leave to Substitute Proposed Amended Pleading [Doc. 20] is an untimely second motion for leave to file an amended complaint. Further, Defendant asserts that Plaintiffs have failed to establish good cause to justify their motion, as they were previously aware of the facts underlying their federal and state securities law claims. Additionally, Defendant claims that he will be prejudiced by the Substitute Complaint, as it "transforms this case from being one based on an alleged legal malpractice and common law alternative theories to professional negligence, to a case involving securities fraud, despite [his argument] that the Plaintiffs were not purchasing a security, nor did [Defendant] ever own a security." [Doc. 26 at 11].

Plaintiffs assert that the Substitute Complaint merely replaces the Second Amended Complaint, as the Court had yet to rule on its pending motion to amend. Further, Plaintiffs maintain that they have established good cause to support an amendment to the Scheduling Order, as they acted diligently in drafting the Substitute Complaint after consulting with a securities fraud expert. Lastly, Plaintiffs assert that Defendant will not be prejudiced by any amendment, as the facts underlying the additional securities fraud claim were alleged in the Second Amended Complaint and no depositions have been taken at this time.

Case 3:19-cv-00365-TRM-DCP   Document 45   Filed 08/12/20   Page 11 of 44   PageID #: 434

Here, as the Court has yet to rule on Plaintiffs' motion to amend which was filed prior to the deadline in the Scheduling Order, the Court will consider the proposed Substitute Complaint in reviewing Plaintiffs' motion for leave to file an amended complaint. *See, e.g.*, *Fife v. Wal-Mart Stores, Inc.*, No. 3:04-CV-535, 2006 WL 8443018, at *2 (E.D. Tenn. May 8, 2006) (reviewing substitute proposed amended complaint, rather than "the first proposed amended complaint[,] when considering plaintiff's motion to amend"); *York v. Town of Limington*, No. CIV. 03-99-P-H, 2004 WL 114985, at *1 (D. Me. Jan. 22, 2004) (granting motion to substitute revised proposed first amended complaint "for the earlier preferred version" and considering the substitute complaint in recommending that the motion to amend be denied).

Additionally, due to the liberal policy in favor of granting amendments set forth in Federal Rule of Civil Procedure 15, the Court finds that Plaintiffs have established good cause if the Court interpreted Plaintiffs' motion [Doc. 20] as a motion for leave to file an amended complaint outside of the deadline set forth in the Scheduling Order. The Court agrees that Plaintiffs acted diligently in drafting an amended complaint to include causes of action for securities fraud. While Defendant claims that "Plaintiffs seek to drastically change the scope and nature of this case when significant deadlines are quickly approaching," Defendant has failed to establish prejudice from the filing of the Substitute Complaint. [Doc. 26 at 11]. The Court recently granted Defendant's motion to modify the scheduling order [Doc. 37] and extensive discovery has not been taken in the present case. Moreover, the underlying facts supporting Plaintiffs' securities fraud claims were set forth in the previous pleadings. Therefore, Plaintiffs' Motion for Leave to Substitute Proposed Amended Pleading [Doc. 20] will be **GRANTED**.

12

### B.     Fraud Claims

In their Substitute Complaint, Plaintiffs seek to include a common law fraud claim against Defendant.  Plaintiffs allege, in the alternative to their legal malpractice claim, that "Defendant was directly involved in perpetrating a scheme to defraud Plaintiffs out of their entire investment," as "there was never a legitimate business opportunity involving the use of investor funds in connection with the purchase of bank instruments or bonds," and that there were not any prequalified investors or legitimate costs related to the renaming, registration or sale of the alleged bonds.  [Doc. 20-1 at ¶ 74].  Plaintiffs claim that they were led to believe that the investment was legitimate because the funds were being kept in Defendant's trust account, Defendant would serve as the "paymaster" and manage and supervise the distribution of the funds, and that they would be provided information about how the funds were being disbursed.  [*Id.* at ¶ 75].  Additionally, Plaintiffs maintain that Defendant's opinion letter "validated the legitimacy of the transaction." [*Id.*].

Next, Plaintiffs allege that "Defendant intended that the funds deposited by Plaintiffs would not be used for any valid purpose. but would be funneled to Dan Masters and other persons," including a transfer of $235,000 to Masters on December 24, 2018 and a transfer of $125,000 to Defendant's personal account on November 26, 2018.  [*Id.* at ¶¶ 76, 79, 84].  Therefore, Plaintiffs allege that "[n]one of the distributions by [Defendant] were for the purchase, renaming, or registration of the bonds," and "[i]n the alternative, Plaintiffs allege that only a fraction of the payments made were utilized for the purposes represented."  [*Id.* at ¶ 80].

However, in his Response to Plaintiffs' Motion for Leave to Substitute Proposed Amended Pleading [Doc. 26], Defendant asserts that Plaintiffs' common law fraud claim is futile.  Defendant maintains that Plaintiffs fail to plead their fraud claim with sufficient particularity, as well as that

Plaintiffs "fail to establish the requisite 'reasonable reliance' in light of the terms of the Iseman JVA." [*Id.* at 13].

In Tennessee, common law fraud (also known as fraudulent or intentional misrepresentation) has six elements:

1) the defendant made a representation of an existing or past fact;

2) the representation was false when made;

3) the representation was in regard to a material fact;

4) the false representation was made either knowingly or without belief in its truth or recklessly;

5) plaintiff reasonably relied on the misrepresented material fact; and

6) plaintiff suffered damage as a result of the misrepresentation.

*Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008); *see Hodge v. Craig*, 382 S.W.3d 325, 342 n.28 (Tenn. 2012). Under Tennessee law, "fraud [is] a generic term broad enough to encompass all acts, omissions, or concealments which involve a breach of legal and equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." *Keith v. Murfreesboro Livestock Mkt., Inc.*, 780 S.W.2d 751, 754 (Tenn. Ct. App. 1989) (internal citation omitted). The cause of action "protects every person's legitimate expectations that he or she can reasonably rely on the representations of others when making decisions—especially business decisions." *Id.*

Additionally, as the Court previously stated, under Rule 9, a plaintiff must allege "*the time, place, and content* of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Elsheick v. Select Portfolio Servicing, Inc.*, 566 F. App'x 492, 498 (6th Cir. 2014) (emphasis in original).

### 1.    Intentional Misrepresentations of Material Fact

Defendant maintains that Plaintiffs have failed to "specify the statements that [they] contend were fraudulent, identify the speaker of such fraudulent statements, state where and when the statements were made, and explain why the statements were fraudulent."  [Doc. 26 at 14]. Defendant asserts that Plaintiffs seek to hold him responsible for all information they received about the transaction, regardless of the source.  Defendant states that Plaintiffs do not allege that he represented that there were prequalified investors for the bonds, and that the Substitute Complaint "clearly demonstrate[s]" that Francisconi, O'Quinn, Davis, and Myers pitched the investment to Plaintiffs and explained how the transaction would work.  [*Id.* at 15].  Moreover, Defendant notes that under the Iseman JVA, ER2—with Myers serving as the signatory—was Plaintiff's contractual business partner, and the JVA specifically contemplates Plaintiffs' funds would "go towards various expenditures that Party 1/ ER2 will have."  [*Id.*]; *see* [Doc. 26-6 at ¶ 6.9].  Therefore, Defendant alleges that Plaintiffs' allegation that none, or in the alternative, only a fraction, of the distributions made by Defendant were for the "purchase, renaming, or registration of the bonds" is conclusory.  [Doc. 26 at 15].

However, Plaintiffs respond that the allegations of the Substitute Complaint satisfy the Rule 9 particularity requirement.  Plaintiffs claim that the Substitute Complaint alleges that several phone calls occurred between Defendant and Iseman after Iseman executed the Client Information Package and Non-Solicitation Agreement.  [Doc. 30 at 8].  Moreover, Plaintiffs assert that the Substitute Complaint details the alleged representations made by Defendant which fraudulently stated "that the investment was legitimate, how the transaction was to operate, and his role in the transaction."  [*Id.*]; *see* [Doc. 20-1 at ¶ 16].

"Although the Federal Rules of Civil Procedure require a plaintiff to plead fraud with particularity, in ruling upon a motion to dismiss pursuant to Fed. R. Civ. P. 9(b), a court must consider the policy of simplicity in pleading embodied in Rule 8." *Johnson v. Equity Title & Escrow Co. of Memphis, LLC*, 476 F. Supp. 2d 873, 884 (W.D. Tenn. 2007) (citing *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988)).

While Defendant claims that Plaintiffs have failed to identify any specific misrepresentations attributable to him, Plaintiffs alleged several representations by Defendant involving the legitimacy of the transaction, how the funds would be used, and Plaintiffs' ability to track and see information about the expenditures made. *Cf First Const., LLC v. Gravelroad Entm't, LLC*, No. CIV. 6:07-155-DCR, 2008 WL 2038878, at *4 (E.D. Ky. May 12, 2008) ("While the Complaint generally states that the Defendants acted fraudulently in failing to use the funds provided to them as set forth under the contract, it fails contain any allegation relating to an alleged misrepresentation upon which the Plaintiff relied. Therefore, the allegations in the Complaint are insufficient to satisfy the heightened pleading standards for fraud claims under Rule 9(b).") (addressing whether the plaintiff alleged a fraud claim sufficient to pierce the corporate veil).

Specifically, in the Substitute Complaint, Plaintiffs allege that Defendant represented that their funds "would be safe" in his attorney trust account, that "he would serve as the 'paymaster' for the distribution of the funds," and that the "funds would be utilized for fees and costs related to the purchase and registration of a bond." [Doc. 20-1 at ¶ 16]. Plaintiffs also allege that Defendant represented that the funds would be tracked, and that Iseman would have access to his IOLTA account and be provided with documentation about how the funds were utilized. [*Id.* at ¶ 17]. These statements are largely reiterated in Defendant's opinion letter included as an exhibit to the executed JVA. *See* [Doc. 26-6].

16

Plaintiffs also allege how Defendant's representations were fraudulent—that they were not provided access to the IOLTA account or documentation on how the funds had been utilized [Doc. 20-1 at ¶¶ 46–47], as well as that "[d]espite the verbal representations of Defendant and the assurances contained in the opinion letter, the Funds were not used by Defendant for the costs and expenses associated with the Bond Instrument" [*Id.* at ¶ 78]. While Defendant claims that these allegations are conclusory, Plaintiffs also allege that Defendant improperly transferred $235,000 to Masters on December 24, 2018 [*Id.* at ¶ 79] and $125,000 to himself on November 26, 2018 [*Id.* at ¶ 84]—transfers that they allege were not costs and expenses associated with the Bond Instrument. Here, Plaintiffs allege that Defendant had a personal, financial interest separate from their legal malpractice claim. Plaintiffs have alleged the general time frame of the alleged intentional misrepresentations, which took place during several conference calls and in Defendant's opinion letter. *See Colbert & Winstead, PC 401(k) Plan v. AIG Fin. Advisors, Inc.*, No. 3:07-cv-1117, 2008 WL 2704367, at *12 (M.D. Tenn. July 8, 2008) (plaintiff's allegation that defendant committed fraud "during a specified six-month period" was sufficient to meet the "heightened pleading requirement of Rule 9(b)"). Plaintiffs' pleading of the time period during which the statements were made is "pled with enough specificity to put defendant[ ] on notice as to the nature of the claim." *Williams v. Duke Energy Intern., Inc.*, 681 F.3d 788, 803 (6th Cir. 2012). Therefore, accepting these well-pled factual allegations as true, the Court finds that Plaintiffs have sufficiently pled the alleged intentional misrepresentations of Defendant.

## 2. Reasonable Reliance

Defendant asserts that "Plaintiffs cannot claim reasonable reliance on any alleged misrepresentations by [Defendant] that were made before Ms. Iseman received, reviewed, changed, and executed the Iseman JVA, which governs the terms of the investment and,

significantly, contradicts the prior representations allegedly made by [Defendant]." [Doc. 26 at 19]. Here, Defendant argues that although Iseman expressed concerns regarding the draft JVA with O'Quinn, she did not speak with Defendant about the draft JVA, as Francisconi and Myers addressed her questions. [*Id.* at 17].

Additionally, Defendant submits that "the terms of the Iseman JVA govern how the underlying transaction was to proceed" and "[u]nder a plain reading of the Iseman JVA, the Plaintiffs were on notice that ER2 was responsible for the actions required to obtain the financial return—not [Defendant]." [*Id.* at 18, 19]. Defendant notes that he is not a party to the Iseman JVA, and under the JVA, ER2 is responsible for "all actions necessary and related to utilizing the Funds to register the Bond Instruments and then sell the Bond Instruments" to ER2's "prearranged Institutional Buyers." [*Id.* at 18]; *see* [Doc. 26-6 at ¶ 6]. Further, Defendant cites to the provision in the Iseman JVA that he was not permitted to answer Plaintiffs' questions without approval from ER2 and Myers. [Doc. 26 at 19]; *see* [Doc. 26-6 at ¶ 6.12]. Therefore, Defendant asserts that Plaintiffs cannot state reasonable reliance on any alleged misrepresentation by Defendant that was made before Iseman reviewed and changed the draft JVA and executed the Iseman JVA which significantly "contradicts the [alleged] prior representations." [Doc. 26 at 19].

Plaintiffs respond [Doc. 30] that the Iseman JVA is not contradictory to all of the alleged misrepresentations made by Defendant. Plaintiffs claim that Defendant's opinion letter, attached as an exhibit to the Iseman JVA, encompasses several of his alleged misrepresentations made before the execution of the JVA. In particular, Plaintiffs assert that the opinion letter and the Iseman JVA both state that the transaction and the funds requirement are valid. Therefore, Plaintiffs allege that both the Iseman JVA "and the misrepresentations of the Defendant are in fact

consistent—both the JVA and Defendant misrepresented how the funds would be used and that the transaction was legitimate." [*Id.* at 10].

In order to establish a fraud claim under Tennessee law, Plaintiffs must show that they "reasonably relied on the misrepresented material fact." *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008). "Generally, a party having the ability and opportunity to inform himself of the contents of a writing before he executes the writing is not justified in relying upon representations where the means of knowledge are readily available to that party." *Bowman v. Waggoner*, No. M2004-00411-COA-R3-CV, 2006 WL 140377, at *4 (Tenn. Ct. App. Jan. 17, 2006); *see also Solomon v. First Nat'l Bank of Nashville,* 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989) ("Generally, a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within his reach.").

Here, the Court finds that Plaintiffs have adequately pled that they reasonably relied on Defendant's misrepresentations, and that such alleged misrepresentations are not contradicted by the Iseman JVA. As the Court detailed above, Plaintiffs allege in their Substitute Complaint that Defendant made representations about the legitimacy of the investment opportunity and that funds would be utilized for fees and costs related to the purchase and registration of the Bond Instrument. *See* [Doc. 201 at ¶ 16]. These alleged misrepresentations are also contained the opinion letter that Defendant prepared. *See* [Doc. 26-6].

While Defendant claims that Plaintiffs cannot establish reasonable reliance, Defendant's alleged misrepresentations about the validity of the transaction and transfer of funds are not contradicted by the Iseman JVA. Rather, provisions of the Iseman JVA mirror Defendant's alleged misrepresentations. The Iseman JVA states that Defendant "substantiates the validity of this funds requirement and opportunity to the Interested Fund Provider, Party 2 / Iseman-Positively-

19

Medieval-LLC." [Doc. 26-6 at ¶ 6.7].  Defendant's opinion letter, attached as an exhibit to and referenced in the Iseman JVA, provides that Defendant "present[s] this opinion letter to substantiate the validity of this funds requirement/opportunity to the interested Fund Providers." [*Id.* at p. 15].  The opinion letter details that all deployed funds will be tracked, with information about the expenditures made available to Plaintiffs.  [*Id.*].  Additionally, Defendant's opinion letter states that "[t]he funds will go towards various expenses associated with the transfer of ownership of the Bond Instrument; proper listing of the Bond . . . and the transfer of the Bond to the purchaser . . . as well as an approved banking entity in Europe for pass-through of the bond within the European Economic Area."  [*Id.*].  Although Defendant is not a party to the Iseman JVA, his alleged misrepresentations are detailed in the attached opinion letter, and his misrepresentations about the validity of the transaction and how the funds were to be used match the language of the Iseman JVA.[2]

Lastly, under Tennessee law, "reasonable reliance is a question of fact for the jury to decide."  *Riggs Drug Co., Inc. v. Amerisourcebergen Drug Corp.*, No. 3:09-cv-538, 2010 WL 3619951, at *5 (E.D. Tenn. Sept. 13, 2010) (citing *Corso Enters., Inc. v. Shop at Home Network, Inc.*, No. 3:04-cv-260 2005 WL 2346986, at *8 (M.D. Tenn. Sept. 26, 2005)).  Therefore, the Court finds that Plaintiffs' Substitute Complaint sufficiently alleges reasonable reliance in support of their fraud claim, such that the amendment of such claim would not be futile.  *Cf. Roopchan v. ADT Sec. Sys., Inc.*, 781 F. Supp. 2d 636, 651 (E.D. Tenn. 2011) ("Plaintiff's intentional

---

[2] The Court further notes that "[t]he Sixth Circuit . . . applying Tennessee law, has recognized that fraudulent representations that conflict with the clear written terms of a contract may support fraud-based claims."  *Hamm v. Wyndham Resort Dev. Corp.*, No. 3:19-CV-426, 2020 WL 1853577, at *11 (M.D. Tenn. Apr. 13, 2020) (citing *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566–67 (6th Cir. 2003) (although *Shah* involved a defendant's representative making false assurances to plaintiffs to induce them to enter into a lease, which were inconsistent with the written agreement; whereas in the present case, Defendant alleges his representations were consistent with the Iseman JVA)).

misrepresentation claim fails because he did not reasonably rely upon Mr. Flack's alleged misrepresentations. In other words, when Plaintiff chose not to read the contract, he failed to exercise ordinary diligence.").

As the Court previously detailed, for their fraud claim, Plaintiffs must also "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), and "detail[ ] the who, what, when, where, and how of the alleged fraud." *Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 489 (6th Cir. 2015) (internal citation and quotation marks omitted). Ultimately, the Court finds that Plaintiffs have sufficiently alleged that Defendant made several false representations that induced them to invest in the alleged scheme and that they justifiably relied on Defendant's representations in choosing to invest, such that their request to add a fraud claim is not futile.

Although considered a heightened pleading standard, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.,* 681 F.3d 788, 803 (6th Cir. 2012). The Court finds that Plaintiffs have satisfied the requirements of Rule 9(b) in pleading with particularity the circumstances constituting fraud.

### C.    TCPA

In their Substitute Complaint, in the alternative to their legal malpractice claim, Plaintiffs allege that Defendant engaged in unfair or deceptive acts and is liable for violating the TCPA under Tenn. Code Ann. § 47-18-104(b)(2), (3), (5), (7), and (49).  [Doc. 20-1 at ¶ 97].  Plaintiffs allege that Defendant's "unfair and deceptive acts . . . were willful or knowing," as he knew that "there was no legitimate investment opportunity . . . that ER2 did not have pre-qualified investors . . . that there were no bank instruments or bonds that would provide the return represented . . . that the

funds were not going to be used for the acquisition of these bonds . . . [and] that the funds were going to be funneled to Dan Masters and other persons."  [*Id.* at ¶ 99].

Defendant, however, asserts that Plaintiffs' claim under the TCPA is futile as no private right of action exists under the TCPA for any alleged unfair or deceptive act involving the marketing or sale of a security.  [Doc. 26 at 23]; *see* Tenn. Code Ann. § 47-18-109(h).  Moreover, Defendant claims that Plaintiffs have failed to adequately plead the existence of a "Ponzi scheme" under Tenn. Code Ann. § 47-18-104(b)(49), as Plaintiffs fail to allege "that any other investors invested money into the underlying transaction, or that the Funds were used to pay back original investors."  [*Id.* at 24, 25].  Therefore, Defendant maintains that even though Plaintiffs allege that the Bond Instrument did not exist and the Iseman JVA was fraudulent, a private right of action is not available under Tenn. Code Ann. § 47-18-109(h), as "[e]ven where an investment contract is the product of a fraudulent scheme, the investment contract is still considered a security."  [*Id.* at 26].

Plaintiffs respond that because the Substitute Complaint alleges that no legitimate investment opportunity existed, "the deceptive acts and practices did not involve the marketing or sale of a security because for the purposes of the TCPA claim[,] no security ever actually existed." [Doc. 30 at 13].  In support, Plaintiffs assert that the Tennessee legislature "intended to leave the claims involving actual securities to state securities laws," as the definition of a security under state law "never includes or purports to include a security that did not actually exist" and the Tennessee Securities Act section granting a private right of action "limits the action to purchasers of a security, sellers of a security, and those who willfully act in a deceitful manner that affects the price at which a security was purchased or sold."  [*Id.* at 14]; *see* Tenn. Code Ann. § 48-1-122. Moreover, Plaintiffs allege that several of the deceptive acts alleged in the Substitute Complaint

are not related to the purchase of a government bond; chiefly "Defendant's failure to inform Plaintiffs about his association with Masters and Levine, and most importantly his legal representation of Masters." [Doc. 30 at 14]. Lastly, Plaintiffs maintain that they have plausibly pled the existence of a Ponzi scheme at this stage "and additional discovery will help develop this claim further." [*Id.* at 15].

To state a claim under the TCPA, the plaintiff must allege that the defendant engaged in an unfair or deceptive act or practice enumerated in section 47-18-104(b). Tenn. Code Ann. § 47–18–109(a)(1). The TCPA lists 51 specific acts or practices that are unlawful. *Id*. at § 47-18-104(b). For a TCPA claim, Plaintiffs must allege: "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA; and (2) that the defendant's conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or things of value wherever situated." *Tucker v. Sierra Builders,* 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (citing Tenn. Code Ann. § 47–18–109(a)(1)). "Claims under the TCPA must be alleged with the same specificity that applies to fraud claims." *Amondson v. Merryfield*, No. 1:18-CV-263, 2019 WL 7563529, at *4 (E.D. Tenn. May 22, 2019) (citing *Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273, 275 (Tenn. Ct. App. 1999)). Tenn. Code. Ann. § 47-18-104(b)(49) also establishes a violation of the TCPA for "[e]ngaging in a Ponzi scheme, defined as a fraudulent investment scheme in which money placed by later investors pays artificially high dividends to the original investor, thereby attracting even larger investments."

However, Tenn. Code Ann. § 47-18-109(h) provides that "[n]o private right of action shall be commenced under this section for any alleged unfair or deceptive act or practice involving the marketing or sale of a security as defined in the Tennessee Securities Act, § 48-1-102." Under the Tennessee Securities Act, a security is defined as:

"Security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, a life settlement investment or any fractional or pooled interest in a life insurance policy or life settlement investment, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing;

Tenn. Code Ann. § 48-1-102(20)(A).

Defendant claims that Plaintiffs fail to adequately plead the existence of a "Ponzi scheme," as he asserts that Plaintiffs fail to allege "that any other investors invested money into the underlying transaction, or that the Funds were used to pay back original investors." [Doc. 26 at 24–25]. Moreover, Defendant alleges that even if Plaintiffs adequately pled the existence of a Ponzi scheme, the Iseman JVA "unquestionably involves a security, i.e. the Bond Instrument" and the "Iseman JVA itself . . . constitutes a security under Tennessee law." [*Id.* at 25]. Therefore, Defendant maintains that even if Plaintiffs sufficiently pled facts to establish violations of Tenn. Code Ann. § 47-18-104(b)(2), (3), (5), (7), or (49), they do not have a private cause of action under Tenn. Code Ann. § 47-18-109(h) "because such unfair and deceptive actions *involve* the marketing and/or sale of a security—i.e., the Bond Instrument and/or an investment contract (the Iseman JVA)." [*Id.*].

Ultimately, at this stage of litigation, the Court finds that additional factual development is necessary to determine whether Defendant's alleged deceptive acts involved "the marketing or sale of a security" under Tenn. Code Ann. §§ 47-18-109(h) and 48-1-102(20)(A). In their Substitute Complaint, Plaintiffs allege "that the unfair and deceptive acts and practices of Defendant are distinct from the marketing or sale of a security, which is expressly excluded by

Tenn. Code Ann. § 47-18-109(h)." [Doc. 20-1 at ¶ 97]. The Court notes a lack of established case law detailing whether an act or practice involves "the marketing or sale of a security as defined in the Tennessee Securities Act, § 48-1-102." Tenn. Code Ann. § 47-18-109(h) (effective October 1, 2011). *See Gregory v. Lane*, No. 3:11-CV-132, 2012 WL 5289385, at *8 (E.D. Tenn. Oct. 24, 2012) ("At that time [March 18, 2011], the sale of securities was a consumer transaction covered by the TCPA. *See Johnson v. John Hancock Funds*, 217 S.W.3d 414, 424 (Tenn. Ct. App. 2006). The TCPA has since been amended to exclude such transactions from its coverage, *see* Tenn. Code Ann. § 47–18–109(h)."); *but see Sledge v. Indico Sys. Res., Inc.*, No. 2:13-CV-2578-STA-CGC, 2016 WL 815348, at *10 (W.D. Tenn. Feb. 29, 2016) (granting plaintiffs' motion for summary judgment, including their claims against defendants under § 10(b) and Rule 10b-5, as "Defendants' conduct operated as a fraud or deceit upon Plaintiffs in connection with the purchase or sale of a security [an investment contract]," but also finding "Defendants made false representations to Plaintiffs in order to induce Plaintiffs to invest in a bogus gold scheme" and "Defendants' conduct was both deceptive and unfair within the meaning of the TCPA").

Defendant maintains that "[e]ven where an investment contract is the product of a fraudulent scheme, the investment contract is still considered a security." [Doc. 26 at 26 (citing *State v. Brewer*, 932 S.W.2d 1, 7, 20–22 (Tenn. Ct. Crim. App. 1996)]. However, in *Brewer*, the Tennessee Court of Criminal Appeals upheld a criminal conviction under the Tennessee Securities Act based on a fraudulent investment contract and found that jury was properly instructed on the definition of an investment contract under the Tennessee Securities Act as set forth in the *Hawaii Market Test*. 932 S.W.2d at 13, 20–22 (Tenn. Ct. Crim. App. 1996). *Brewer*, and the subsequent adoption of the *Hawaii Market Test* in Tennessee, does not alter the Court's analysis regarding the pleading of inconsistent claims at this time. *See Winston v. Zaehringer*, No. 1:19-CV-216, 2020

WL 3259531, at *13–14 (E.D. Tenn. June 16, 2020) ("Tennessee adheres to the *Hawaii Market Test*, to determine if a contract is an 'investment contract,' and "[t]his test provides a broader definition of an investment contract than federal law.") (citing *King v. Pope*, 91 S.W.3d 314, 320–21 (Tenn. 2002)).

While Plaintiffs' assertion that their TCPA claim is not futile is inconsistent with the Court's subsequent finding that the Iseman JVA constitutes an investment contract at this time, the pleading of inconsistent claims is allowable under Federal Rule of Civil Procedure 8. Under Rule 8(d)(3), "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). "The Federal Rules of Civil Procedure permit pleading in the alternative and even the pleading of inconsistent claims." *Son v. Coal Equity, Inc.*, 122 F. App'x 797, 802 (6th Cir. 2004) (citing former Fed. R. Civ. P. 8(e)(2)); *see, e.g.*, *Brahmamdam v. TriHealth, Inc.*, No. 1:19-CV-152, 2020 WL 620009, at *2 (S.D. Ohio Feb. 10, 2020), *report and recommendation adopted sub nom.*, *Brahmamdam v. Tri Health, Inc.*, 2020 WL 1491397 (S.D. Ohio Mar. 27, 2020); *Ajuba Intern., LLC v. Saharia*, 871 F. Supp. 2d 671, 688 (E.D. Mich. 2012) ("Under Rule 8, a pleading does not become insufficient by reason of a party having made alternative, or even contradictory, claims."). "While Rule 8(d)(3) allows inconsistent claims, 'it does not allow a plaintiff to make clashing factual assertions . . . in the context of the same claim.'" *Brahmamdam*, 2020 WL 620009 at *2 (quoting *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1015 (S.D. Ohio 2016)) (additional internal citation and quotation marks omitted).

Defendant asserts that "Plaintiffs do not plead the federal and state securities fraud in the alternative to their TCPA claim, although they specify that such claims are in the alternative to their legal malpractice claim." [Doc. 26 at 26 n.15]. However, under Rule 8, Plaintiffs may allege separate inconsistent causes of action. Additionally, the inconsistencies are related to separate

26

claims, rather than inconsistent factual assertions within the same claim. *See Aaron*, 209 F. Supp. 3d at 1015 ("The distinction between inconsistent claims, which are permissible, and inconsistent factual allegations in support of a single claim, which are not, 'is especially pertinent in cases alleging fraud.'") (quoting *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 406–07 (S.D.N.Y. 2001)).

"In considering Defendant's futility argument, '[a]t this stage of the litigation, this Court is charged with determining whether the futility of an amendment is so obvious that it should be disallowed.'" *Ewalt v. Gatehouse Media Ohio Holding II, Inc.*, No. 2:19-CV-4262, 2020 WL 1904744, at *1 (S.D. Ohio Apr. 17, 2020) (quoting *Bear v. Delaware Cty., Ohio*, No. 2:14-CV-43, 2015 WL 1954451, at *3 (S.D. Ohio Apr. 28, 2015)). As reviewing whether the alleged deceptive acts by Defendant involve the marketing or sale of a security "would require the [u]ndersigned to directly address the merits of the complaint . . . [i]t is 'the better exercise of discretion to permit the amendment' and allow Defendant to address the sufficiency of the pleadings in a dispositive motion before the District Judge." *Id.*; *see also Durthaler v. Accounts Receivable Mngmt., Inc.*, 2:10-cv-1068, 2011 WL 5008552, at *4 (S.D. Ohio Oct. 20, 2011) ("[I]t is usually a sound exercise of discretion to permit the claim to be pleaded and to allow the merits of the claim to be tested before the District Judge by way of a motion to dismiss."); *SJF Material Handling, Inc. v. Motor City Scrap, Inc.*, No. 08-14187, 2009 WL 1025383 (E.D. Mich. April 15, 2009) (denying motion for leave to amend complaint with respect to claims that were clearly futile, but granting leave to amend with respect to other claims whose merits may be more appropriately challenged in a motion for summary judgment).

Here, additional factual development is required for the Court to adequately determine whether Plaintiffs' allegations involve the marketing or sale of a security. Plaintiffs' Substitute

Complaint does not assert "clashing factual assertions," but rather alternative theories of recovery. *Aaron v. Medtronic, Inc.*, 209 F. Supp. 3d 994, 1015 (S.D. Ohio 2016) (quoting *Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 175 F. Supp. 2d 489, 492 (S.D.N.Y. 2000)). Such a determination would ultimately require the undersigned to evaluate the merits of Plaintiffs' TCPA cause of action. Therefore, the Court finds that Plaintiffs' TCPA claim is not futile at this time.

### D. Federal Securities Fraud

In their Substitute Complaint, in the alternative to their legal malpractice claim, Plaintiffs assert that Defendant is liable for violating SEC Rule 10b-5 and Section 10(b) of the Securities and Exchange Act of 1934 ("the 1934 Act"). [Doc. 20-1 at ¶ 109].

Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 makes the following unlawful in connection with the purchase or sale of any security:

(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b–5.

Plaintiffs allege that the Bond Instrument and the transaction at issue constitute a security and Defendant "knowingly or recklessly made material representations to Plaintiffs verbally during the various conference calls wherein he attested to the legitimacy of the transaction and the

process by which the transaction would take place," as well as in writing in the opinion letter he provided about the legitimacy of the transaction. [Doc. 20-1 at ¶¶ 110–11]. Additionally, Plaintiffs assert that Defendant's material misrepresentations led Iseman to believe the transaction was a "legitimate investment opportunity," subsequently transfer $650,000 to Defendant, and Plaintiffs "have not received the promised payment from the security transaction and have not been refunded the money paid to Defendant despite repeated requests." [*Id.* at ¶¶ 112–13]. Plaintiffs allege that Defendant's material representations led directly to their loss because he knew that "the transaction was a sham and . . . that the funds provided by Plaintiffs would never be invested into any security." [*Id.* at ¶ 114]. Lastly, Plaintiffs "deny that Defendant was the attorney for Dan Masters in connection with this scheme," but even if so, Defendant's "wrongful means and wrongful acts, including intentional misrepresentations, wire fraud, and other illegal acts, subject[ ] him to personal liability outside the litigation privilege." [*Id.* at ¶ 115].

Defendant claims that Plaintiffs do not have standing to assert a cause of action for federal securities fraud, that the 1934 Act does not apply to the securities transaction at issue, and Plaintiffs fail to satisfy the pleading requirements of the PSLRA. [Doc. 26 at 27–28]. The Court will address Defendant's arguments in turn.

### 1. Standing

Defendant maintains that Plaintiffs, either jointly or individually, were not the "purchaser(s)" of a security, and therefore they do not have standing to assert a private cause of action under section 10(b) of the 1934 Act or Rule 10b-5. [Doc. 26 at 30–31]. First, Defendant asserts that the Court is directed to "narrowly construe private actions for federal securities fraud," and as Plaintiffs "had no contractual right to purchase securities," they do not have standing to assert claims under Section 10(b) or Rule 10b-5. [*Id.* at 29]. Defendant submits that although "the

Iseman JVA clearly involves a security, i.e. the Bond Instrument, ER2 (or perhaps another non-party) was the sole owner of the Bond Instrument." [*Id.* at 30]. Next, Defendant asserts that the Iseman JVA states that certain "prearranged Institutional buyers" would then purchase the Bond Instrument, and thus "[n]o sale of the Bond Instrument to the Plaintiffs is contemplated." [*Id.* at 30–31]; *see* [Doc. 26-6 at ¶6]. Therefore, Defendant maintains that as Plaintiffs would not have an ownership interest in the Bond Instrument, they were not purchasers of a security, and do not have standing to assert a private cause of action under Section 10(b) or Rule 10b-5.

Plaintiffs respond [Doc. 30 at 16–18] that they purchased an interest in the joint venture, and therefore have standing to assert a cause of action for securities fraud. Plaintiffs state that the definition of the term security under the Securities Act expressly includes an investment contract. *See* 15 U.S.C. § 78c(a)(10). Plaintiffs claim that "the relevant security . . . includes the JVA itself," which Defendant "admits in its own brief, the executed JVA is an investment contract and, thus, a security." [Doc. 30 at 16]. Therefore, Plaintiffs maintain that they have standing to pursue a cause of action for federal securities fraud as when they invested $650,000 into the joint business venture, they purchased a security.

Section 10(b) of the 1934 Act and SEC Rule 10(b) make it unlawful to make misleading statements "in connection with the purchase or sale" of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.[3] Although Section 10(b) does not explicitly provide a private cause of action, the Supreme Court "has found a right of action implied in the words of the statute and its implementing regulation," Rule 10b-5. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157

---

[3] The Supreme Court has recognized that "[t]he scope of Rule 10b–5 is coextensive with the coverage of §10(b)." *SEC v. Zandford*, 535 U.S. 813, 816 n. 1 (2002) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)). As a result, the Court may "use § 10(b) to refer to both the statutory provision and the Rule," unless otherwise noted. *Id. See also In re Omnicare Inc. Secs. Litig.*, 769 F.3d 455, 461 n. 1 (6th Cir. 2014).

(2008). As the Sixth Circuit explained in *In re Omnicare Securities Litigation*, "[t]here are six elements to a securities-fraud suit under § 10(b) of the 1934 Act and SEC Rule 10b–5: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" 769 F.3d 455, 469 (6th Cir. 2014) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)).

"The requirement that only purchasers or sellers have standing to sue under [S]ection 10(b) and Rule 10b–5 was established by the Court of Appeals for the Second Circuit in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956 (1952), and subsequently ratified by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975)." *Doll v. James Martin Assocs. (Holdings) Ltd.*, 600 F. Supp. 510, 520 (E.D. Mich. 1984).

Defendant claims Plaintiffs do not have standing to assert a private cause of action under Section 10(b), as "[n]o sale of the Bond Instrument to the Plaintiffs is contemplated," and thus they were not purchasers of a security. [Doc. 26 at 31]; *see Rathborne v. Rathborne,* 683 F.2d 914, 918 (5th Cir. 1982) ("[E]ven if it can be established that there has been wrongdoing in connection with the purchase or sale of a security, a private party does not have standing to recover under Rule 10b–5 unless the plaintiff can allege and ultimately establish that he himself was a purchaser or seller.").

"The federal securities laws define 'security' as including an 'investment contract.'" *SEC v. Merklinger,* 489 F. App'x 937, 940 (6th Cir. 2012) (quoting 15 U.S.C. §§ 77b(a)(1), 78c(a)(10)). In *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946), the Supreme Court set forth the factors relevant to deciding whether a transaction qualifies as an "investment contract." *Id.* at 298–99 ("[A]n investment contract for purposes of the Securities Act means a contract, transaction or

31

scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.").  Under the *Howey* test, "[a]n investment contract involves (1) an investment of money (2) in a common enterprise (3) with a reasonable expectation of profits to be derived solely from the efforts of others."  *SEC v. Prof'l Associates*, 731 F.2d 349, 352–53 (6th Cir. 1984).

Here, the Court finds that Plaintiffs have sufficiently alleged that they were purchasers of an investment contract.  The *Howey* test "is a flexible one, 'capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'"  *Stone v. Kirk*, 8 F.3d 1079, 1085 (6th Cir. 1993) (quoting *Howey,* 328 U.S. at 299).  First, Plaintiffs invested funds as conditioned in the JVA when they transferred $650,000 to Defendant's IOLTA account.  Plaintiffs engaged in a common enterprise under the Iseman JVA, as Plaintiffs allege that Myers and ER2, along with Defendant, would assist in registering the Bond Instrument, which ER2 would then sell to one of its "prearranged institutional buyers"  *See* [Doc. 20-1 at ¶ 29].  Moreover, Plaintiffs allege that their funds would be tied to the purchase of a banking instrument or bond, which would be bundled with other, similar bonds and sold to pre-qualified investors, typically returning three to four times the principal.  [*Id.* at ¶ 11].  *See Stone*, 8 F.3d at 1086 ("It is well established that a joint venture interest can qualify as a security where the investor is 'entirely passive and [where he] invested in the joint ventures in reasonable reliance on the expected efforts and expertise of the [managers].'") (quoting *SEC v. Professional Associates*, 731 F.2d 349, 357 (6th Cir. 1984)).  Lastly, Plaintiffs allege that they had a reasonable expectation of profits derived solely from the efforts of others, as the Iseman JVA details that they would receive a return of $5,000,000 within 90 to 120 days.  [Doc. 26-6 at ¶ 31].

Further, even assuming that the Bond Instrument was a "'nonexistent security,' many courts have extended jurisdiction under the federal securities laws to cases alleging fraud in connection with the offer, purchase and sale of securities which do not actually exist." *U.S. S.E.C. v. Lauer*, 864 F. Supp. 784, 792 (N.D. Ill. 1994) (collecting cases), *aff'd sub nom.*, *S.E.C. v. Lauer*, 52 F.3d 667 (7th Cir. 1995); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 85 n. 10 (2006) (noting the SEC supports a "broad reading of the 'in connection with' language as "a broker who accepts payment for securities that he never intends to deliver . . . violates § 10(b) and Rule 10b–5.") (citations and quotations omitted); *SEC v. Zandford,* 535 U.S. 813, 819 (2002) (holding that the SEC may bring a public enforcement action against a broker who accepted payment for securities that he never delivered); *Grippo v. Perazzo* 357 F.3d 1218, 1220–24 (11th Cir. 2004) ("A plaintiff does not need to identify a specific security, or demonstrate that his money was actually invested in securities" for purposes of Rule 10b–5).

Although further discovery may reveal that the Plaintiffs' interests in the Iseman JVA do not constitute an investment contract, "the question of '[w]hether or not [Plaintiffs'] membership interests are ultimately determined to be investment contracts is more appropriately addressed in a summary judgment motion.'" *Schentag v. Nebgen*, No. 1:17-CV-8734-GHW, 2018 WL 3104092, at *7 (S.D.N.Y. June 21, 2018) (addressing membership interests in international LLCs) (quoting *Automated Teller Mach. Advantage LC v. Moore*, No. 08-cv-3340 (RMB), 2009 WL 2431513, at *4 (S.D.N.Y. Aug. 6, 2009)). Therefore, Plaintiffs have standing at this time to bring forth claims under Section 10(b) and Rule 10b–5 for federal securities fraud.

### 2. Section 10(b) of the 1934 Act

Defendant contends that "neither the 1934 Act nor Rule 10b-5 applies to the securities transaction contemplated by the Iseman JVA" under the Supreme Court's holding in *Morrison v.*

33

*National Australia Bank Ltd.*, 561 U.S. 247 (2010). [Doc. 26 at 35]. Defendant claims that the Supreme Court in *Morrison* held that a private right of action under Section 10(b) applies "only [to] transactions in securities listed on domestic exchanges, and domestic transactions in other securities." [*Id.* at 35–36 (citing *Morrison*, 561 U.S. at 267)]. Defendant notes that the Supreme Court rejected the test proposed by the Solicitor General for fraud involving significant conduct in the United States. Additionally, Defendant maintains that although the Dodd-Frank Wall Street Reform and Consumer Protection Act explicitly grants jurisdiction to federal district courts for an action or proceeding brought by the Commission or the United States for securities fraud involving "conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States," the holding of *Morrison* limiting the scope of private securities fraud litigation has not been overruled. [*Id.* (quoting 15 U.S.C. § 77aa(b))]. Therefore, Defendant asserts that allowing Plaintiffs' claims under Section 10(b) or Rule 10b-5 would be futile because "the Iseman JVA specifically contemplates that the Bond Instruments were to be listed on . . . an international stock exchange and/or traded in Europe." [*Id.* at 37].

Plaintiffs respond [Doc. 30 at 21] that the 1934 Act is applicable as the relevant security alleged in the Substitute Complaint is the Iseman JVA as an investment contract, rather than the Bond Instrument. Plaintiffs maintain that the Iseman JVA "was formed entirely within the United States," as ER2's principal address is in Wyoming, Plaintiffs are located in California, and Defendant performed his role in the transaction in Tennessee. [*Id.*]. Therefore, Plaintiffs allege that the Iseman JVA, as the applicable security, meets the *Morrison* test.

In *Morrison*, the Supreme Court limited the private right of action under Section 10(b) to "the use of a manipulative or deceptive device or contrivance only in connection with the purchase

or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 561 U.S. at 273. The Supreme Court held that because "the focus of the [1934 Act] is not upon the place where the deception originated, but upon purchases and sales of securities in the United States, Section 10(b) applies "only" to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* at 267.

Therefore, the Court must consider the "extraterritoriality" of the transaction alleged in the Substitute Complaint. *Id.* at 265. Defendant correctly states that the Bond Instrument was not listed on an American stock exchange and argues that the Iseman JVA "makes it apparent that the Bond Instrument was to be listed on an international stock exchange and/or traded in Europe." [Doc. 26 at 37]. Plaintiffs' claims may, in fact, be futile if the only applicable security is the Bond Instrument.

However, the Court previously found that Plaintiffs' Substitute Complaint sufficiently alleges that the Iseman JVA is an investment contract, thus giving them standing to pursue federal securities fraud claims at this time. The Court notes that the Sixth Circuit has not significantly interpreted the definition of a domestic transaction under *Morrison*. *See Lay v. United States*, 623 F. App'x 790, 792–93 (6th Cir. 2015) ("The Supreme Court framed the issue before it narrowly: 'We decide whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges.' . . . The Court dismissed the complaint for failure to state a claim because the allegations involved no securities listed on a domestic exchange, and most, but not all, of the purchases occurred outside the United States.") (quoting *Morrison*, 561 U.S. at 273). Other circuits nationwide have adopted a rule "that a plaintiff plausibly alleges a domestic transaction where he claims either the 'title to the shares was transferred within the U.S.' or the

purchaser or seller incurred 'irrevocable liability' within the United States." *Melvin v. Brayshaw*, No. EDCV19712-JGB-SPX, 2019 WL 6482220, at *3 (C.D. Cal. Oct. 3, 2019) (quoting *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 948 (9th Cir. 2018), wherein the Ninth Circuit adopted the irrevocable liability test set forth in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012)); *see also SEC v. Scoville*, 913 F.3d 1204, 1215 (10th Cir. 2019) (allowing SEC commencement of section 10(b) civil enforcement action involving an extraterritorial transaction with alleged domestic conduct and "foreseeable substantial effect[s]" in the United States).

Here, the Court finds that Plaintiffs have plausibly alleged that the Iseman JVA qualifies as an investment contract, as well as that the Iseman JVA was a domestic transaction, such that their federal securities fraud claims are not futile. While the Bond Instrument was not intended to be registered on an American stock exchange, the Substitute Complaint alleges that all parties to the Iseman JVA are located in the United States, the conversations between Iseman and Defendant took place while Defendant was located in Tennessee and Iseman was in California, and ultimately the JVA was executed in the United States. *Cf. Melvin*, 2019 WL 6482220 at *3 ("The FAC is devoid of allegations from which the Court could infer irrevocable liability incurred or that title transferred in the United States."). Further, Plaintiffs transferred $650,000 to Defendant's IOLTA account located in Tennessee. *See Lykuong Eng v. Akra Agric. Partners, Inc.*, No. 5:16-CV-00994 (RCL), 2017 WL 5473481, at *3 (W.D. Tex. Aug. 9, 2017) ("This Court agrees with the assertion that a wire transfer to the United States alone is not sufficient to establish a domestic transaction. However . . . plaintiff alleged facts that plausibly suggest a meeting of the minds occurred in the United States, an agreement was entered in the United States, and a wire transfer was made to a United States bank while plaintiff was in the United States."); *see also Loginovskaya v.*

36

*Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (finding that "[t]he direction to wire transfer money to the United States is insufficient to demonstrate a domestic transaction"). Accordingly, at this stage, the Court finds that Plaintiffs have sufficiently alleged that their investment in the Iseman JVA constituted a domestic transaction under Section 10(b) of the 1934 Act.

### 3. PSLRA Pleading Requirements

Defendant claims that Plaintiffs "fail to satisfy the heightened pleading requirements of the PSLRA," and therefore the addition of their claims under Section 10(b) or Rule 10b-5 would be futile. [Doc. 26 at 35].

Under the PSLRA, the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1). The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Scienter, a defendant's "intention to deceive, manipulate, or defraud" must be stated with particularity. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). "A strong inference of scienter 'must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (quoting *Tellabs*, 551 U.S. at 314). The proper inquiry for the Court in evaluating allegations of scienter is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation meets that standard." *Tellabs*, 551 U.S. at 322–23 (emphasis in

37

original); *see also Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency.").

Defendant agree that Plaintiffs "aver that [he] 'made representations about the legitimacy of the investment opportunity, described how the transaction would work, and described his role' as the 'paymaster,' as well as explained how the Funds would be tracked." [Doc. 26 at 33 (quoting Doc. 20-1 at ¶¶ 16–17)]. Additionally, Defendants submit that Plaintiffs allege that the opinion letter "substantiated the legitimacy of the investment and described how the Funds would be utilized." [*Id.* (quoting Doc. 20-1 at ¶ 26)]. However, Defendant repeats his argument to Plaintiffs' common law fraud claim and asserts that all other information that Plaintiffs learned about the transaction came from other individuals in connection with the execution of the Iseman JVA.

Moreover, Defendant claims that Plaintiffs fail to state specific facts or explain the basis for their allegation that there was never a legitimate business opportunity, that there were never prequalified investors, that there were never any legitimate costs, or that their invested funds were never intended to be used for any legitimate purpose. Defendant alleges that "under a plain reading" of the Substitute Complaint, he did not make any statements regarding prequalified investors. [*Id.* at 34]. Next, Defendant claims that Plaintiffs fail to allege specific facts for their claim that "[n]one of the distributions by Werner were for the purchase, renaming, or registration of the bond," or alternatively that "only a fraction of the payments were utilized for the purposed represented." [*Id.* (quoting Doc. 20-1 at ¶ 80)]. Lastly, Defendant asserts that although Plaintiffs allege that he intended for their invested funds to not be used for any valid purpose, but instead funneled to Masters and other persons, they "offer no facts to support their claim that these

38

transfers evidence fraud." [*Id.*]. Defendant claims that these transfers "are expressly contemplated by the Iseman JVA." [*Id.*]. Therefore, Defendant asserts that "the corresponding allegation that [he] 'knew that the transaction was a sham' is a result of 'heap[ing] inference upon inference.'" [*Id.* at 35 (quoting [Doc. 20-1 at ¶¶ 113–14; *In re Omnicare Inc. Secs. Litig.*, 769 F.3d 455, 482 (6th Cir. 2014))].

Plaintiffs respond that the allegations in the Substitute Complaint, as well as the referenced exhibits, specifically detail Defendant's misrepresentations, and "because other parties to the transaction also made misrepresentations does not somehow lessen Defendant's own culpability." [Doc. 30 at 19]. Plaintiffs maintain that they explain how the statements are misleading in its common law fraud claim, and that the Substitute Complaint alleges that "Defendant had a motive to defraud Plaintiffs, which supports an inference of scienter." [*Id.* at 20].

First, the Court already found that Plaintiffs plausibly alleged a common law fraud claim, meeting the requirements of Federal Rule of Civil Procedure 9. Additionally, to determine whether Plaintiffs have "alleged facts that give rise to the requisite 'strong inference' of scienter," the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323. Here, Plaintiffs have alleged that Defendant was acting in concert with other parties to represent the legitimacy of the transaction, and that his material misrepresentations led them to invest. Defendant asserts that Plaintiffs cannot identify facts to support their allegations that there were never any prequalified investors or that he improperly made transfers to Masters and other individuals. However, Plaintiffs have alleged that Defendant transferred $125,000 of Plaintiff's funds into his own account [Doc. 20-1 at ¶ 94] and $235,000 to Masters [*Id.* at ¶ 79], despite the fact that these transfers were not contemplated by the Iseman JVA. *See Tellabs,* 551 U.S. at 325 (noting pecuniary "motive can be a relevant

consideration, and personal financial gain may weigh heavily in favor of a scienter inference"). Lastly, Plaintiffs have alleged that Defendant did not provide them access to IOLTA account and information about distributions, and ultimately stopped responding to Plaintiffs.

Therefore, the Court finds that Plaintiffs have pled the requisite scienter of Defendant to where the addition of a securities fraud claim would not be futile at this point. *See id.* at 324 (holding that the "inference of scienter [must be] more than merely 'reasonable' or 'permissible,'" i.e., "a reasonable person would deem the inference . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged").

"In short, after considering the proposed amendments and the arguments of the parties, the Court cannot say at this stage of the proceedings that [Plaintiffs have] failed to sufficiently detail [their] claims under the PSLRA or that [they] will be unable to prove any set of facts that would entitle [them] to relief against the defendant[ ] on [their] fraud or securities laws claims." *See Greenwald v. Holstein*, No. 2:15-CV-2451, 2016 WL 9344297, at *5 (S.D. Ohio Feb. 3, 2016). Although the Court balances the heightened pleading standard of the PSLRA, "[a]t this stage of the litigation, this Court is charged with determining whether the futility of an amendment is so obvious that it should be disallowed." *Bear v. Delaware Cty., Ohio*, No. 2:14-CV-43, 2015 WL 1954451, at *3 (S.D. Ohio Apr. 28, 2015). The Court agrees that "substantial arguments" exist regarding Plaintiffs' securities fraud claims which are better suited for resolution at a later stage of litigation. *Greenwald*, 2016 WL 9344297 at *5.

### E. Tennessee Blue Sky Law

Lastly, Plaintiffs seek leave to allege a cause of action that Defendant is liable for violating the Tennessee Securities Act of 1980 ("Tennessee's Blue Sky Law")—Tennessee Code Annotated § 48-1-122(A)(1)(B). *See* [Doc. 20-1 at ¶ 117]. Plaintiffs allege that "Tennessee's Blue Sky Law

provides a private right of action against a person who, in connection with the offer or sale of a security, makes a material misstatement of fact or operates in a fraudulent or deceitful manner." [*Id.* at ¶ 118].

Defendant claims, however, that "[w]hile the Bond Instrument itself falls within the definition of T.C.A. § 48-1-102(20)(A), and the Plaintiffs' investment opportunity involved the 'marketing or sale of a security,' the Plaintiffs were not the purchaser of the Bond Instrument, and, critically, [Defendant] was not the seller of the Bond Instrument." [Doc. 26 at 38]. Therefore, Defendant asserts that Plaintiff's cause of action under the Tennessee Blue Sky Law would be futile, as T.C.A. § 48-1-122(a)(1)(B) "has no application to the facts of this case." [*Id.*].

Plaintiffs respond that under the Blue Sky Law, "the purchaser/seller distinction is irrelevant because liability may be imposed upon an aider and abettor pursuant to Tenn. Code Ann. § 48-1-122(g)." [Doc. 30 at 22]. Plaintiffs claim that "Defendant's interpretation may have resulted from a drafting error" in the Substitute Complaint, as Plaintiffs "intended to cite to Tenn. Code Ann. § 48-1-122(g)," rather than Tenn. Code Ann. § 48-1-122(a)(1)(B). [*Id.*].

"Tennessee state securities law mirrors the federal law." *Great Am. Opportunities, Inc. v. Cherry Bros., LLC*, No. 3:17-CV-01022, 2019 WL 632670, at *3–4 (M.D. Tenn. Feb. 14, 2019) (citing *Bass v. Janney Montgomery Scott, Inc.*, 152 F. App'x 456, 459 (6th Cir. 2005)). Tennessee Code Annotated Section 48-1-122(a)(1)(B) states that any person who:

> Sells a security in violation of § 48-1-121(a) (the purchaser not knowing of the violation of § 48-1-121(a), and who does not carry the burden of proof of showing that the person did not know and in the exercise of reasonable care could not have known of the violation of § 48-1-121(a));
>
> shall be liable to the person purchasing the security from the seller to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security, or, if the purchaser no longer owns the security, the amount that would be recoverable upon a tender, less the value of the security when the

purchaser disposed of it and interest at the legal rate from the date of disposition.

However, Tennessee's Blue Sky Law also imposes liability for those who aid and abet securities fraud, providing that:

> Every person who directly or indirectly controls a person liable under this section, every partner, principal executive officer, or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the person who would be liable under this subsection (g) proves that the person who would be liable did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.

Tenn. Code Ann. § 48-1-122(g).

"Given the breadth of this section, at least one case in [the Middle District of Tennessee] has held that, where the plaintiff has alleged that the 'defendants were generally involved' in the business at issue and 'had the power to control the transactions in which the securities fraud occurred,' the plaintiff has sufficiently stated a claim under Section 122(g)." *Receiver of assets of Mid-Am. Energy, Inc. v. Coffman*, 719 F. Supp. 2d 884, 893 (M.D. Tenn. 2010) (quoting *Colbert & Winstead, PC 401(k) Plan v. AIG Fin. Advisors, Inc.*, No. 3:07-1117, 2008 WL 2704367, *7–8 (M.D. Tenn. July 8, 2008)). In *Coffman*, the plaintiffs alleged that the Defendant was "a well-connected 'bag man' in the scheme, who also drafted the relevant documents, communicated with investors, diverted funds, and instructed employees how to carry out their jobs." *Id.* The *Coffman* court also found that the defendant "stood to gain financially from the alleged fraud." *Id.* Therefore, the Middle District of Tennessee held that those "allegations indicate clear 'general involvement' and 'control' as to the alleged securities fraud[.]" *Id.*

Similarly, the Court finds that the Substitute Complaint sufficiently alleges a violation of the Tennessee Blue Sky Law under section 48-1-122(g). As the Court has previously detailed, Plaintiffs allege that Defendant made representations about the legitimacy of the investment opportunity, encouraged Plaintiffs to invest, and had control over the invested funds, as well as their distribution. *See* [Doc. 20-1 at ¶¶ 16, 26]. Plaintiffs have also alleged that Defendant "stood to gain financially from the alleged fraud," as $125,000 was deposited into his personal bank account. *Coffman*, 719 F. Supp. 2d at 893; *see* [Doc. 20-1 at ¶ 84].

Additionally, parallel to the Court's analysis of Plaintiffs' federal securities fraud claims, the Court notes that the Tennessee Securities Act includes "investment contracts" under Tenn. Code Ann. § 48-1-102(20)(A), "Tennessee adheres to the *Hawaii Market Test*, to determine if a contract is an 'investment contract,' and "[t]his test provides a broader definition of an investment contract than federal law." *Winston v. Zaehringer*, No. 1:19-CV-216, 2020 WL 3259531, at *13–14 (E.D. Tenn. June 16, 2020) (citing *King v. Pope*, 91 S.W.3d 314, 320–21 (Tenn. 2002)).

Ultimately, the Court finds that Plaintiff's proposed claim under the Tennessee Blue Sky Law is not futile, and upon the filing of their Substitute Complaint, Plaintiffs are directed to supplement the citation to Tennessee Code Annotated § 48-1-122(g).

# V. CONCLUSION

Accordingly, for the reasons stated above, Plaintiffs' Motion for Leave to Amend Complaint [Doc. 18] and Plaintiffs' Motion for Leave to Substitute Proposed Amended Pleading [Doc. 20] are **GRANTED**, and Defendant's Motion for Hearing [Doc. 32] is **DENIED**. Plaintiffs **SHALL** file their operating Substitute Complaint [Doc. 20-1], with the alterations detailed above, in CM/ECF **within seven days** of entry of the instant Memorandum and Order and Defendant may file his response consistent with the Federal Rule of Civil Procedure.

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge